UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THOMAS P. DYE, | ) | Case No. 09cv2483-BLM |
| | ) | |
| Petitioner, | ) | **ORDER DENYING PETITION FOR** |
| v. | ) | **WRIT OF HABEAS CORPUS AND** |
| | ) | **DENYING MOTION FOR AN** |
| KEN CLARK, Warden, | ) | **EVIDENTIARY HEARING** |
| | ) | |
| Respondent. | ) | [Doc. No. 1, 13] |
| | ) | |

On November 4, 2009, Petitioner Thomas P. Dye, a state prisoner proceeding pro se and in forma pauperis, filed the instant Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Doc. Nos. 1, 1-1 ("Petition" and "Pet.'s Mem."). Pursuant to the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to the jurisdiction of a United States Magistrate Judge. Petition at 11; Doc. No. 8. On February 19, 2010, Respondent filed an Answer to the Petition.[1] Doc. Nos. 11, 11-1 ("Answer" and "Resp.'s Mem."). On March

---

[1]Petitioner named both the California Attorney General and Ken Clark, the warden of the facility where Petitioner is incarcerated, as respondents. Petition at 1. Rule 2 of the Rules following 28 U.S.C. § 2254 provides that the state officer having custody of petitioner shall be named as respondent. Rule 2(a), 28 U.S.C. foll. § 2254. The structure of the California penal system places prisoners in the custody of both the Secretary of the California Department of Corrections and Rehabilitation and the warden of the California prison where petitioner is incarcerated. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 895 (9th Cir. 1996). Thus, Ken Clark, the warden, is a proper respondent, whereas the Attorney General of the State of California, is not.

19, 2010, Petitioner filed a Reply to the Answer ("Reply"), a memorandum of points and authorities in support thereof ("Reply Mem."), and a Motion for an Evidentiary hearing.  See Doc. Nos. 13, 14.  For the reasons set forth below, the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus and Motion for an Evidentiary Hearing.

**STATEMENT OF FACTS**

The following facts are taken directly from the California Court of Appeal's opinion affirming Petitioner's conviction in The People v. Thomas P. Dye, Super. Ct. Nos. SCN172719, SCN147314.

> 1.   Emily Phillips-counts 8 (residential burglary), 9, 10 (grand theft of personal property and an automobile) and 11 (unlawful taking and driving a vehicle)
>
> In February 1999, Dye introduced himself to Phillips under a false name. Within a short period of time, Dye moved into her home and offered to help reduce her substantial credit card debt. Phillips gave Dye $4,700, believing his statement that he would give the money to an attorney friend to reduce her credit debt. Dye dropped Phillips off where she worked and borrowed her car to meet the attorney, but then failed to pick Phillips up as previously arranged. When Phillips returned home, she found that all of Dye's belongings were gone, as well as her car, social security card, passport, credit cards, driver's license, money and other items. Phillips immediately called the police and reported the theft.
>
> The following month, Dye responded to an ad for a roommate in Denver, Colorado using the name Tommy Phillips. The female landlord contacted the police after Dye questioned her about her financial affairs. When the police arrived, they ran the license plate number of the vehicle that Dye had been seen driving and learned that it was registered to Phillips and had been reported stolen.
>
> In August 1999, the People filed a felony complaint against Dye in San Diego for the crimes committed against Phillips (SCD147314). After the police arrested Dye in Denver, he bailed himself out of jail and then jumped bail.
>
> . . .
>
> 3.   Lilia Antillon-counts 1 (residential burglary), 2 (grant [sic] theft of personal property), 3 & 5 (forgery of

---

Accordingly, this Court sua sponte **DISMISSES** the allegations against the California Attorney General and **TERMINATES** him as a respondent in this case.

checks), 4 & 6 (burglary), and 7 (failure to appear while on bail)

In November 2002, while out on bail on the Phillips matter, Dye began dating Antillon in San Diego and, at some point, she moved enough clothing into Dye's room at the Island Inn to enable her to stay there for a couple of days at a time. As the relationship progressed, Dye started asking her lots of questions regarding her finances. In December 2002 and January 2003, Dye presented checks written from Antillon's account to the Island Inn for rent; the checks were written for more than the amount due and he received a total of $300 cash back. One day, Dye disappeared after stealing Antillon's driver's license and credit card. Although Antillon initially believed that Dye had also stolen her truck because he had the keys, she later found the truck but discovered that an expensive gold chain inside it was missing. After Dye's disappearance, Antillon discovered the earlier theft and forgery of her checks.

On October 30, 2003, the People filed an information against Dye in San Diego for his crimes against Antillon (SCD172719). In August 2003, Chicago police arrested Dye for another offense and sent him back to San Diego for prosecution.

Lodgment 7 at 2-3, 5-6.

## PROCEDURAL BACKGROUND

In August 1999, the People of the State of California filed a complaint in San Diego charging Petitioner with the crimes relating to Phillips described above.  Lodgment 1 at 650-54.  In September 2001, while Petitioner was in custody in Illinois and South Dakota on separate charges, Petitioner filed a motion in San Diego seeking dismissal of the pending San Diego charges on the basis that his Sixth Amendment right to a speedy trial had been violated.  Id. at 858-64, 866-72, 875-77, 581-92.  In December 2001, Petitioner arrived in San Diego, was arraigned on the Phillips complaint, and renewed his motion to dismiss.  Id. at 865, 602-30.  In January 2002, a superior court judge presided over a lengthy evidentiary hearing addressing the speedy trial issues raised in Petitioner's motion to dismiss.  Lodgment 3, Volumes 1-4.  On February 14, 2002, the court issued a written order denying Petitioner's motion

to dismiss the complaint.  Lodgment 1 at 677-86.

In November 2002, Petitioner posted a $100,000 bond and was released from custody.  Id. at 900-901.  On January 22, 2003, Petitioner failed to appear for a court hearing and an arrest warrant was issued. Id. at 907-8.  In August 2003, Petitioner was arrested in Illinois for a new crime and returned to San Diego in September 2003.  Lodgment 7 at 6.  On October 30, 2003, the People filed a new information charging Petitioner with crimes committed against Antillon while he was out of custody on bail during the criminal proceedings on the Phillips charges. Id.

On July 14, 2004, the prosecution filed an amended information joining the Phillips and Antillon cases after the trial court granted its consolidation motion.  Lodgment 2 at 1-9; see also Lodgment 3, Volume 4 at 163-64.  In addition to the above-mentioned eleven counts, the amended information alleged that Petitioner committed counts one through seven while out on bail, and that he had sixteen probation denial priors, five prison priors, three serious felony priors and three strike priors.  Lodgment 2 at 1-9.  Petitioner waived his right to a jury trial and a bench trial commenced on July 20, 2004.  Lodgment 1, Volume 2 at 554-55; Lodgment 3, Volume 4 at 197-201; Lodgment 3, Volume 5 at 209.

On July 29, 2004, the trial court found Petitioner not guilty of the residential burglary charge as to Antillon and its associated bail violation allegation (count one), but guilty of all other charges (counts two-eleven) and all associated allegations that he had committed the crimes while out on bail (counts two-seven).  Lodgment 3, Volume 6 at 641-44; Lodgment 1, Volume 2 at 564.  The trial court also found true the allegations that Petitioner had five prison priors, two serious

felony priors, and two strike priors.  Lodgment 3, Volume 6 at 645-48; Lodgment 1, Volume 2 at 564.  On October 12, 2004, the court dismissed two strikes under California Penal Code section 1385 and then sentenced Petitioner to a total of 23 years in prison.  Lodgment 3, Volume 6 at 672-73, 676-80; Lodgment 1, Volume 2 567-68.

The People appealed the court's finding that Petitioner's Illinois attempted robbery conviction did not qualify as a serious felony prior and a strike prior.  Lodgment 6.  The People further contended that the trial court abused its discretion when it struck two of Petitioner's prior strikes.  Id.  Petitioner also appealed the judgment, arguing that the trial court (1) violated his rights to a speedy trial and due process with respect to the Phillips convictions; (2) abused its discretion in consolidating for trial the crimes against both victims; (3) erred by admitting uncharged acts evidence; and (4) committed judicial misconduct.  Lodgment 5.  Petitioner also asserted that (1) the burglary convictions as to Antillon should be reversed because he had an absolute right to enter the premises; (2) the judgment should be reversed because he received ineffective assistance of counsel; and (3) the cumulative effect of all errors warranted reversal.  Id.

The appellate court affirmed Petitioner's conviction on April 14, 2006, with the exception of a partial reversal and remand for resentencing as a result of the People's appeal.  Lodgment 7. Petitioner filed a petition for review with the California Supreme Court on May 17, 2006, presenting only the claim directed at his right to a speedy trial.  Lodgment 8.  His petition was summarily denied on July 12, 2006.  Lodgment 9.

On November 29, 2006, on remand for resentencing, the San Diego Superior Court denied Petitioner's motion to strike the three prior

strike allegations. Lodgment 2 at 120-21; Lodgment 4 at 39-42. The court sentenced Petitioner to a term of 150 years to life in prison under the three strikes law, consisting of consecutive terms of twenty-five years to life on counts two, three, five, seven, eight and ten. Id. The court also imposed an additional seventeen years, consisting of three consecutive serious felony prior enhancements (Cal. Penal Code § 667 (a)), plus two years consecutive for an "on bail" enhancement (Cal. Penal Code § 12022.1(b)). Id. All other counts and enhancements were ordered stayed or stricken, pursuant to California Penal Code sections 654 and 1385, respectively. Id.

On January 2, 2008, Petitioner appealed his sentence, arguing that the court erred by reconsidering his entire sentence, finding true a prior strike conviction that previously had been stricken, and failing to strike his prior strike convictions.[2] Lodgment 10. Petitioner also argued that his sentence constituted cruel and unusual punishment. Id. On August 14, 2008, the appellate court affirmed the judgment. Lodgment 12. Petitioner filed a petition for review with the California Supreme Court on September 15, 2008 (Lodgment 13), which was summarily denied on October 22, 2008 (Lodgment 14).

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on April 29, 2009, arguing that the trial court erred by allowing evidence of uncharged acts and trial and appellate counsel provided ineffective assistance. Lodgment 15. On September 23, 2009, the California Supreme Court summarily denied the petition. Lodgment 16. On November 4, 2009, Petitioner filed the instant petition for writ of habeas corpus. Petition.

---

[2]In his opening brief, Petitioner also argued that the People's appeal was untimely; however, with permission of the court, he withdrew this argument in a supplemental letter. See Lodgment 12 at 1.

**<u>Legal Standard</u>**

Title 28 of the United States Code, section 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.   Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   Summary denials constitute adjudications on the merits.   <u>See</u> <u>Luna v. Cambra</u>, 306 F.3d 954, 960 (9th Cir. 2002).   Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.   <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law; or (2) "confronts facts that are materially indistinguishable from a

7                                                                    09cv2483-BLM

relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." Williams v. Taylor, 529 U.S. 362, 405 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). "[A] federal habeas court may not issue a writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly . . . . Rather, that application must be objectively unreasonable." Id. (emphasis added) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions." Williams, 529 U.S. at 412.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); Wood v. Allen, __ U.S. __, 2010 WL 173369, *2 (U.S. Jan. 20, 2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome

1  that presumption only by clear and convincing evidence.   28 U.S.C.

2  § 2254(e)(1).

3  ## Discussion

4  Petitioner raises three grounds for relief.  Petition.  He argues

5  that this Court should reverse his conviction because (1) his right to

6  a speedy trial was violated, (2) his trial and appellate counsel

7  provided ineffective assistance of counsel, and (3) his due process

8  rights were violated by the admission of "prior bad act evidence."  Id.

9  Respondent argues that this Court should deny the instant petition

10 because Petitioner

11    has failed to demonstrate that the decision by the California
      state courts rejecting [Petitioner's] claims on the merits was
12    contrary to, or involved an unreasonable application of,
      clearly established federal law, or was based on an
13    unreasonable determination of the facts as presented in the
      state court proceeding.

14

15 Resp.'s Mem. at 1.

16 **A. Speedy Trial Claim**

17 Petitioner complains that his constitutional right to a speedy

18 trial was violated by the California state courts.  Pet.'s Mem. at 4.

19 He explains that although his right to a speedy trial with respect to

20 the crimes he committed against Phillips (counts eight-eleven) attached

21 on November 24, 1999, he was not brought to California to face the

22 charges until December 19, 2001, over two years later.  Id. at 6.  He

23 argues that this substantial delay prejudiced him in that his defense

24 was "impaired" and he "remained in prison past his scheduled release

25 date."  Id. at 12.  Respondent asserts that Petitioner's claim is

26 "meritless."  Resp.'s Mem. at 14.

27 **[1]. Facts Relating to the Speedy Trial Claim**

28 On November 24, 1999, while in custody in Illinois on

9                                                          09cv2483-BLM

local charges, Dye was arraigned on a fugitive complaint regarding his crimes against Phillips, demanded a trial and refused to waive extradition to California. In December 1999, Dye pleaded guilty to the Illinois charges and was sentenced to prison. On January 5, 2000, the San Diego District Attorney's Office lodged a detainer against Dye seeking his temporary custody under the Agreement. (§ 1389, Art. IV(a).) Dye refused to waive extradition and refused to sign the "request for final disposition of charges" form that would have allowed his transfer to California.

Between January and June 2000, the San Diego District Attorney's Office telephoned the Illinois Department of Corrections to check on the status of its transfer request, but corrections personnel initially indicated that they were not sure where Dye was being housed and then advised that he had been transferred to a prison in South Dakota to serve the rest of his Illinois prison term. In July 2000, the San Diego District Attorney's Office learned that the Illinois Department of Corrections had lost the request for temporary custody and was looking for it. During this time period, the San Diego District Attorney's Office made more telephone calls to the Illinois Department of Corrections to check on Dye's status. In August 2000, the San Diego District Attorney's Office received a letter from the Governor of Illinois indicating he "authorized" the transfer. The San Diego District Attorney asserted, however, that the letter did not give San Diego the authority to take custody of Dye and it was not the equivalent of an offer of temporary custody under the Agreement.

Dye was unsure whether he or his attorney had requested a hearing under Cuyler v. Adams (1981) 449 U.S. 433 (Cuyler) to oppose the proposed transfer; nonetheless, as of September 2000, the Illinois Department of Corrections knew that such a hearing was to be held, but did not know whether it would occur in Illinois or South Dakota. Four months later, the San Diego District Attorney's Office learned that South Dakota would hold the Cuyler hearing once it obtained the necessary papers.

In March 2001, Dye again refused to waive extradition, claiming prison personnel only provided him with a blank form without the required information regarding what charges he was facing in California. During this time period, Dye learned that he had a right to demand trial in California under the Agreement and filed a "federal enjoinment action." Dye also testified that he hired an attorney to contact officials in South Dakota and Illinois to ascertain if the necessary paperwork had come in under Article IV of the Agreement, discovered there was no detainer against him and did not learn about the detainer until just before his scheduled August 2001 release date.

The Cuyler hearing was held in October 2001 and Dye

1   appealed the resulting transfer order. On November 13, 2001,
2   the Illinois and South Dakota Departments of Corrections
    issued offers "to deliver temporary custody" of Dye. On
3   December 6, 2001, the San Diego District Attorney's Office
    accepted temporary custody and Dye appeared in San Diego the
    following week to answer the charges against him relating to
4   Phillips.

5       The Honorable Ronald L. Styn held a hearing on Dye's
    motion to dismiss and issued a ten-page order denying the
6   motion. The trial court assumed that Dye had been subject to
    continuous restraint since November 1999, and that his right
7   to a speedy trial triggered at that point. After evaluating
    the factors articulated in <u>Barker v. Wingo</u> (1972) 407 U.S. 514
8   (Barker), the trial court concluded that the delay was
    presumptively prejudicial, but was justifiable insofar as
9   California was concerned because the negligence of Illinois
    could not be imputed to the California prosecutor. It also
10  concluded that Dye's actions reduced the weight that should be
    given to his request for a speedy trial and that he failed to
11  show actual prejudice. After Dye's reconsideration motion was
    denied, he waived statutory time for trial and time under the
12  Agreement process.

13  Lodgment 7 at 3-5.

14  **2. The California Court of Appeal's Decision**

15      In evaluating the merits of Petitioner's claims, this Court must

16  "look through" to the last reasoned state court decision. <u>See</u> <u>Ylst</u>, 501

17  U.S. at 801-06.  Petitioner presented his speedy trial claim on direct

18  appeal to the California Court of Appeal and the California Supreme

19  Court.  <u>See</u> Lodgments 5, 8.  Because the California Supreme Court

20  summarily denied his petition for review (Lodgment 9), the last reasoned

21  state court decision came from the California Court of Appeal, Fourth

22  Appellate District.  <u>See</u> Lodgment 7.  In its opinion, the appellate

23  court found that Petitioner's constitutional right to a speedy trial was

24  not violated.  <u>Id.</u> at 7-13.  The court reasoned:

25      Here, the trial court assumed that Dye's right to a
    speedy trial attached in November 1999 when, while in custody
26  in Illinois, he was arraigned on a fugitive complaint
    regarding this case and demanded a trial. For purposes of
27  analysis, we also assume that Dye's right to a speedy trial
    attached at this point and examine the remaining <u>Barker</u>
28  factors in light of the approximately two-year delay between

his demand for a trial and appearance in San Diego.

As to the reasons for the delay, there is nothing in the record suggesting that the prosecution deliberately failed to extradite Dye in order to hamper his defense and any delay engendered by negligence is weighed "less heavily" against the government. (Barker, supra, 407 U.S. at p. 531.) In reviewing whether the prosecution was negligent, we must examine the procedure it used to transfer Dye to California. Here, the prosecution lodged a detainer against Dye seeking his temporary custody under Article IV(a) of the Agreement in January 2000. The Agreement, codified by section 1389, establishes procedures for resolution of one jurisdiction's outstanding criminal charges against another jurisdiction's prisoner. (§ 1389, Art. I.) Once a detainer is lodged, the warden of the correctional institution in which the prisoner is incarcerated is required to inform the prisoner of all outstanding detainers and his or her right to request final disposition of the criminal charges underlying those detainers. (§ 1389, Art. III(c).) If the prisoner requests final disposition, then the receiving state is required to bring the prisoner to trial within 180 days of the request or dismissal will result, unless the receiving state moves for a continuance. (§ 1389, Art. III(a).)

If the prisoner does not initiate procedures leading to transfer and disposition of the charges under Article III, the prosecutor may do so under Article IV and trial must then be commenced within 120 days of the arrival of the prisoner in the receiving state. (§ 1389, Art. IV(c).) Prisoners also have the right to a judicial hearing in which they can bring a limited challenge to the receiving state's custody request. (Cuyler, supra, 449 U.S. at p. 449.)

The detainer lodged by the prosecution properly noticed its source and the charges against Dye. Dye acknowledged that in January 2000 and March 2001, he received forms whereby he could make a request for final disposition, but complained that he never received any information about the charges against him and refused to sign the forms for that reason. Assuming the veracity of Dye's assertions, this would have resulted only from negligence by the Illinois and South Dakota officials in failing to inform him of the contents of the detainer. However, negligent compliance with the Agreement by out of state officials generally does not preclude prosecution in another state. (Fex v. Michigan (1993) 507 U.S. 43, 51-52.)

Nonetheless, Illinois and South Dakota officials were negligent in other respects. In 2000, the San Diego District Attorney's Office telephoned the Illinois Department of Corrections on numerous occasions to check on the status of Dye's transfer request, but the out of state personnel initially did not know Dye's location, lost the request for temporary custody and did not know where the Cuyler hearing would be held. In 2001, the San Diego District Attorney's

12

Office made over 20 phone calls to South Dakota or Illinois checking on the status of its transfer request. Inexplicably, the <u>Cuyler</u> hearing was not held until October 2001. After Dye appealed the resulting transfer order, the Illinois and South Dakota Departments of Corrections issued offers "to deliver temporary custody" of Dye the following month. Within four weeks, the San Diego District Attorney's Office had accepted temporary custody and Dye appeared in San Diego to answer the charges.

The issue is whether the negligence of these out of state officials can be imputed to California for the purposes of analyzing whether the prosecution caused the delay. In <u>People v. Hill</u> (1994) 37 Cal.3d 491, 497 (<u>Hill</u>), our high court concluded that the risk of negligence by the California Department of Corrections should be borne by the prosecution and not the defendant for speedy trial purposes. <u>Hill</u>, however, did not address the instant situation where another state, over which the prosecutor had no control, caused the delay. Significantly, the Sixth Amendment right to a speedy trial requires a state to make a diligent, good faith effort to bring a prisoner serving a prison term in another state to trial. (<u>Smith v. Hooey</u> (1969) 393 U.S. 374, 383.) Thus, the primary question is whether the prosecution here made a diligent, good faith effort to transfer Dye to California for trial.

After considering all the evidence, the trial court specifically found that the prosecution acted in good faith and with due diligence and this implied finding of no negligence is reviewed with deference. (<u>Doggett</u>, <u>supra</u>, 505 U.S. at p. 652.) Dye complains that the prosecution did nothing besides making telephone calls and sending e-mails to enforce compliance with the Agreement and failed to use other means to secure his transfer. The specific purpose of the Agreement, however, is to expedite proceedings to secure speedy trials for defendants facing charges in one jurisdiction and already incarcerated in another. (§ 1389, Art. I.) Illinois did not know Dye's location for a period of time and Dye was incarcerated in both Illinois and South Dakota. Given these circumstances, Dye does not explain how a writ of habeas corpus ad prosequendum, governor's warrant, federal action or an executive agreement to obtain custody would have expedited his transfer.

We must also examine Dye's desire for a speedy trial in light of his other conduct. (<u>United States v. Loud Hawk</u> (1986) 474 U.S. 302, 314.) Notably, after Dye's arraignment on the fugitive warrant and request for trial in November 1999, he never requested a prompt disposition of the California charges against him. Dye's failure to assert his right to a speedy trial indicates he might have believed that the delay was to his benefit, in which case he cannot now complain that his right to a speedy trial has been violated. (<u>Barker</u>, supra, 407 U.S. at pp. 521, 528-529, 531-532.) Had Dye truly been

interested in a speedy trial on the California charges, he could have asserted his rights under Article III of the Agreement to start the 180-day clock for dismissal of his charges or waived the <u>Cuyler</u> hearing.

Critically, over a year passed from the time that the Illinois Department of Corrections knew about the <u>Cuyler</u> hearing and the commencement of the hearing. Dye admitted that in March or April 2001, he learned of his right to demand trial in California under the Agreement and he knew "a lot" about the Agreement process when he refused to waive extradition in March 2001. Dye also admitted that he refused to waive extradition or his rights under the Agreement, refused to be transferred to California and appealed the results of the <u>Cuyler</u> hearing. Although Dye claimed he never attempted to delay his transfer to California and was unsure whether he or his attorney had requested the <u>Cuyler</u> hearing, the trial court disbelieved these assertions, concluding that Dye had insisted on the hearing and that his actions contributed to the delay of his prosecution. The trial court is in the best position to judge the credibility of the evidence and we give considerable deference to its findings. (<u>See</u> <u>Doggett</u>, <u>supra</u>, 505 U.S. at p. 653.) Moreover, Dye's actions after his return to San Diego (jumping bail and then committing crimes against Antillon) strongly show that proceeding to trial was the last thing he wanted.

Where, as here, the prosecution proceeded with reasonable diligence, the defendant must show specific prejudice for his speedy trial claim to succeed. (<u>Doggett</u>, <u>supra</u>, 505 U.S. at p. 656; <u>United States v. Aguirre</u> (9th Cir.1993) 994 F.2d 1454, 1457, <u>cert. denied</u>, 510 U.S. 1029.) Prejudice is assessed in the light of the interests that the speedy trial right is designed to protect, including: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. (<u>Barker</u>, supra, 407 U.S. at p. 532.) Of these subfactors, "the most serious is the last, because the inability of a defendant [to] adequately ... prepare his case skews the fairness of the entire system." (<u>Ibid.</u>)

Dye does not argue that he suffered anxiety and concern regarding the unresolved California charges and it is important to note that he was serving an Illinois sentence for all but the last three months of his incarceration before his transfer to San Diego. Although Dye was not released in August 2001 as he had expected because of the detainer against him, he does not argue that the additional three months of incarceration was oppressive. Dye asserts that the delay impaired his defense because his own ability to recall facts that occurred in 1999 was hampered and because he could not locate witnesses who could have testified that he did not return to Phillips's home on the day in question and that Phillips had financial troubles. Phillips, however, admitted she was a student with little or no money and $20,000 in

credit card debt and testified that she gave Dye her money and allowed him to use her car for the sole purpose of reducing her debt. Although Dye complains that the passage of time prevented him from locating witnesses, he does not explain how these witnesses were critical to his defense against these charges.

In summary, the conduct of Illinois and South Dakota personnel is insufficient to tip the scales in Dye's favor given the diligent actions of the prosecution in pursuing Dye under the Agreement. Dye also failed to assert a speedy trial right until after his transfer to San Diego, undertook actions that delayed any possibility of trial and suffered little or no prejudice resulting from the delay. After balancing all four factors, we conclude the trial court did not err in holding that Dye was not denied a speedy trial under the federal constitution.

Id. at 8-13.

### 3. Federal Law and Analysis

"The Sixth Amendment guarantees that, '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy...trial....'" Doggett v. United States, 505 U.S. 654, 651 (1992) (citing the Sixth Amendment of the United States Constitution); see also United States v. Beamon, 992 F.2d 1009, 1012 (9th Cir. 1993). This right is "fundamental" and imposed by the Due Process Clause of the Fourteenth Amendment on the states. Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967). The Sixth Amendment Speedy Trial Clause is broad on its face; however, its breadth has been qualified by case law which recognizes the weight of four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to defendant. Doggett, 505 U.S. at 651; see also Barker v. Wingo, 407 U.S. 514, 530-32 (1972). None of the four factors are either a necessary or sufficient condition for finding a speedy trial deprivation. Barker, 407 U.S. at 533. They are "related factors and must be considered together with such other circumstances as may be relevant." Id.

However, the first factor, the length of delay, is a threshold question and Doggett breaks this inquiry into two steps. Doggett, 505 U.S. at 651-52; Beamon, 992 F.2d at 1012.  To trigger a speedy trial inquiry, an accused must show that the period between indictment and trial passes a threshold point of "presumptively prejudicial" delay. Barker, 407 U.S. at 530; Beamon, 992 F.2d at 1012.  Prejudice normally is presumed if the delay in bringing the defendant to trial has exceeded one year.  Doggett, 505 U.S. at 652, n.1.  If this threshold is not met, the court does not proceed with the other Barker factors.  Id. at 651-52; Barker, 407 U.S. 530; Beamon, 992 F.2d at 1012.  If, however, the threshold showing is made, "the court considers the extent to which the delay exceeds the threshold point in light of the degree of diligence by the government and acquiescence by the defendant to determine whether sufficient prejudice exists to warrant relief."  Beamon, 992 F.2d at 1012.

The Interstate Agreement on Detainers ("IAD"), codified under California statutory law by § 1389, is "an agreement between California, 47 other states, and the federal government," facilitating the resolution of detainers, based on untried indictments, informations or complaints filed in one jurisdiction, against defendants who have been imprisoned in another jurisdiction.  People v. Lavin, 88 Cal.App.4th 609, 612 (2001) (internal quotations omitted).  Under the IAD, "'[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " Id. (quoting United States v. Mauro, 436 U.S. 340, 359 (1978)).  Section 1389 should be read in light of Barker v. Wingo, which sets forth the guidelines for properly determining the speedy trial issue.  People v. MacDonald, 27

16

Cal.App.3d 508, 511 (1972).

The IAD establishes a procedure under which a prisoner, against whom a detainer has been lodged, may demand trial within 180 days of a written request for final disposition properly delivered to the prosecutor and appropriate court of the prosecutor's jurisdiction. § 1389, Art. III, subd. (a); Lavin, 88 Cal.App.4th at 612. The prisoner's only requirement under the IAD "is to advise the warden of his request for final disposition of the charges on which the detainer is based." People v. Wilson, 69 Cal.App.3d 631, 636 (1977).

Here, Petitioner's right to a speedy trial with respect to the crimes he committed against Phillips (counts eight-eleven) attached on November 24, 1999; yet, he was not brought to California to face the charges until December 2001. Lodgment 7 at 3, 5; Lodgment 1, Volume 1 at 1-2. The appellate court correctly determined that this two year delay was "presumptively prejudicial" and that the Court therefore must consider the remaining Barker factors. Lodgment 7 at 3, 5; see Doggett, 505 U.S. at 652, n.1.

With regard to the second factor, the "reasons for the delay," the appellate court determined that the California "prosecution acted in good faith and with due diligence" and that the delay was not due to the California prosecution's negligence but rather to the negligence of officials in Illinois and South Dakota. Lodgment 7 at 8-10. This Court finds that this was a reasonable determination of the facts in light of the evidence presented in the state court proceeding. The judge presided over a four-day hearing that included lengthy testimony from several witnesses, including Petitioner, numerous exhibits, and extensive arguments by counsel. Lodgment 3, Volumes 1-4 at 1-403. The evidence showed that the California prosecutors made numerous attempts

to transfer Petitioner to California, including lodging a detainer against Petitioner pursuant to Article IV(a) of the IAD and telephoning officials in Illinois or South Dakota on more than twenty occasions to check on the status of the transfer. Id. The evidence also established that officials in Illinois and/or South Dakota failed to inform Petitioner of the contents of the detainer, were unaware of Petitioner's location, lost the request for temporary custody, and inexplicably delayed the Cuyler hearing.[3] Id. Accordingly, there was ample evidence supporting the state court's findings and this Court finds the state court's findings and analysis on this point to be reasonable.[4]

Third, the court properly examined "[Petitioner's] desire for a speedy trial in light of his other conduct." Lodgment 7 at 11 (citing United States v. Loud Hawk, 474 U.S. 302, 314 (1986). The court found that Petitioner, although admittedly aware of his rights under the IAD, failed to assert his right to a speedy trial after his November 1999

---

[3]In Cuyler v. Adams, 449 U.S. 433 (1981), the United States Supreme Court held that prisoners facing transfer by detainer pursuant to the IAD were entitled to a pre-transfer hearing to challenge the charging state's custody request.

[4]Petitioner also argues, as he did to the court of appeal, that the California prosecution should have used "other means," including a writ of habeas corpus ad prosequendum, governor's warrant, federal action or an executive agreement, to secure his transfer. Pet.'s Mem. at 7-10; Reply Mem. at 1-2. He cites a United States Supreme Court opinion, Smith v. Hooey, 393 U.S. 374 (1969), in support of this argument. Pet.'s Mem. at 7; Reply Mem. at 2. As the court of appeal noted, given the circumstances outlined above, there is no indication that any of these proposed "other means" would have expedited his transfer. Lodgment 7 at 10-11. Moreover, in Hooey, the petitioner was imprisoned in a federal penitentiary in Kansas when he was indicted in Harris County, Texas, on a charge of theft. Hooey, 393 U.S. at 375. He repeatedly asked to be brought to trial on the state charges; however, the state took no action. Id. The Court held that upon demand of a person incarcerated in a federal penitentiary who is charged with a state crime, the charging state is required to make a diligent, good faith effort to obtain the accused for trial on the pending state charge. Id. at 383. Unlike in Hooey, where the state "took no steps to obtain the petitioner's appearance...in the trial court," here, as detailed above, California made a diligent, good faith effort to secure Petitioner's transfer. Id. at 375. Accordingly, the Court finds that the court of appeal's decision is consistent with the Supreme Court's decision in Hooey.

arraignment, failed to assert his rights under Article III of the IAD, and failed to waive the <u>Cuyler</u> hearing.  <u>Id.</u>  Additionally, Petitioner refused to waive extradition or his rights under the IAD, refused to be transferred to California, and appealed the results of the <u>Cuyler</u> hearing.  <u>Id.</u>  The record contains extensive evidence, including Petitioner's own admissions, supporting the court's finding.  Lodgment 3, Volumes 1-4.  As the court of appeal stated, "[h]ad [Petitioner] truly been interested in a speedy trial on the California charges," he would have taken actions in furtherance, not in contravention, of that interest.  Lodgment 7 at 11.  Essentially, by failing to take one or more of these actions, Petitioner contributed to his delay and he "cannot now complain that his right to a speedy trial has been violated."  <u>Id.</u> (citing <u>Barker</u>, 407 U.S. at 521, 528-29, 531-32).  Accordingly, this Court finds that the state court's findings and analysis on this point also were reasonable.[5]

Finally, the court determined that Petitioner did not suffer "specific prejudice" as a result of the delay.  Lodgment 7 at 12-13.  In analyzing the prejudice factor, <u>Barker</u> identified three interests protected by the speedy trial rights: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern, and (3) limiting the possibility that delay will impair the defense.  <u>Barker</u>, 407 U.S. at 532-33.  Of these three subfactors, "the most serious is the last, because the inability of a defendant [to] adequately...prepare his case skews the fairness of the entire system."  Lodgment 7 at 12 (quoting <u>id.</u>

---

[5]The Court also notes, as did the court of appeal, that Petitioner's actions after he returned to California to face the Phillips charges (jumping bail and then committing similar crimes against Antillon) "strongly show that proceeding to trial was the last thing he wanted."  Lodgment 7 at 12.

at 532).   The court of appeal applied these factors and found that Petitioner did not establish any significant prejudice on either of the first two subfactors.   Id.   Regardless of the pending California charges, Petitioner was serving an Illinois sentence for all but the last three months of his incarceration before his transfer to San Diego. Lodgment 3, Volumes 1-4.   Petitioner did not present evidence that he suffered anxiety and concern regarding the unresolved California charges nor did he establish that the additional three months of incarceration was oppressive.   Id.   Therefore, the Court finds that the state court's analysis of these two subfactors was reasonable.

With respect to the third subfactor, the court of appeal found that the delay did not impair Petitioner's defense.   Lodgment 7 at 12-13. Petitioner argues, as he did to the court of appeal, that the delay prejudiced his defense because his "own ability to recall the facts and circumstances surrounding the events of that period of time in 1999 [was] hampered" and because he could not locate witnesses who could have testified that he did not return to Phillips' home on the day in question and that Phillips had financial troubles.   Pet.'s Mem. at 12. Yet, with respect to "witnesses who could have verified that he did not go back to Phillips' house on the day in question," Petitioner did not identify any particular witness who could no longer be found.[6]   Id.   Nor did he present evidence of efforts to find such witnesses.   Id. Moreover, with respect to witnesses who could have testified "that Ms.

_____

[6]In a pretrial hearing, Petitioner's trial counsel generally alluded to "neighbors" who, "if they could be found and called as witnesses," would testify that Petitioner did not go back to Phillips' house on the day in question.  Pet.'s Appendix 31.  However, this speculative and conclusory statement is insufficient to demonstrate that Petitioner was prejudiced by the delay in bringing him to trial. Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (vague speculation or mere conclusions unsupported by record are not sufficient to state claim).

Phillips was financially in trouble," Petitioner does not explain, nor can this Court discern, how these witnesses were crucial to his defense. Id. As the court of appeal stated, the testimony regarding Phillips' financial troubles would have added little or no value as Phillips herself testified that she was a student in serious credit card debt and that she gave Petitioner her money for the sole purpose of reducing her debt. Lodgement 7 at 12-13; see also Lodgment 3, Volume 5 at 218, 220-23. Therefore, it is not likely that the testimony would have had an impact on the outcome of the case. Finally, Petitioner's claim that he was unable to recall facts that incurred in 1999 is conclusory as he fails to explain exactly what facts were forgotten or how these facts would have aided in his defense. Accordingly, the state courts' determination that Petitioner did not suffer prejudice as a result of the delay was reasonable.

The California Court of Appeal properly balanced the four Barker factors and reasonably concluded that Petitioner was not denied a speedy trial under the United States Constitution. Accordingly, this Court finds that the court of appeal's determination was not contrary to or an unreasonable application of clearly established law, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Therefore, the Court **DENIES** habeas relief on this claim.

**B. Ineffective Assistance of Counsel Claim**

Petitioner alleges that he was denied his Sixth Amendment right to effective assistance of counsel because his trial attorney (1) failed to investigate and prepare for trial, (2) failed to adequately cross-examine Phillips and Antillon, (3) failed to file a written response to the prosecution's motion to admit evidence pursuant to California

Evidence Code § 1101(b), and (4) delivered an inadequate closing argument.[7]   Pet.'s Mem. at 14-20.   Petitioner also argues that his appellate attorney provided inadequate representation because he failed to cite federal law in connection with the improper admission of prior bad act evidence claim.   <u>Id.</u> at 20-21.   Respondent argues that Petitioner "has not shown that trial counsel's purported deficiencies resulted in prejudice." Resp.'s Mem. at 23.

### 1. The California Court of Appeal's Decision

In its opinion, the California Court of Appeal concluded that Petitioner was not denied effective assistance of counsel.   Lodgment 7 at 23-28.   The court of appeal explained:

> In arguing for a continuance, Dye's prior counsel noted that the prosecution's motions were "no-brainers." After noting how old the case was, the trial court stated that defense counsel was "very capable [and] competent" and could immediately respond to the motions. Despite its comments, the trial court moved the hearing date a couple of weeks and told defense counsel that oral responses were "perfectly acceptable." On the date set for the hearing on the motions, defense counsel sought to withdraw based on a conflict. After granting the motion to withdraw, the trial court informed new counsel (noted to be the fourteenth or fifteenth counsel for Dye) that it would accept oral responses to the motions. Defense counsel later orally argued that consolidation would be unduly prejudicial and the uncharged acts evidence should

---

[7]Petitioner also argues that trial counsel failed to contact prior counsel and investigators.   Pet.'s Mem. at 17-18.   However, as Respondent points out, this claim is not properly before this Court, as it was not fairly presented to the California Supreme Court. <u>Wooten v. Kirkland</u>, 540 F.3d 1019, 1025 (9th Cir. 2008); <u>see</u> Resp.'s Mem. at 27-28; Lodgments 8, 13, 15.   In any event, the Court reviewed the record and finds that Petitioner's claim also fails on the merits.   The record clearly reflects that trial counsel contacted Petitioner's previous attorneys.   Lodgment 4, Volume 4C at 134.   Trial counsel also contacted prior investigators, including Miriam Pasas, Tara Glasford, and Shannon Lodder. <u>Id.</u>; Pet. Mem. at 18; Lodgment 3, Volume 6 at 584.   In fact, Ms. Lodder, ultimately testified in Petitioner's defense at trial.   Lodgment 3, Volume 6 at 584-597. As Petitioner's fifteenth attorney (<u>see</u> Lodgment 3, Volume 4C at 142), it would have been unrealistic and unproductive to require him to contact all those who preceded him.   For the above reasons, the Court finds that trial counsel's actions fell well within the wide range of reasonable representation.   <u>Hensley v. Crist</u>, 67 F.3d 181, 184 (9th Cir. 1995).   Moreover, Petitioner has not shown that counsel's conduct prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).   Therefore, Petitioner's claim fails.

not be admitted. Although the trial court granted the consolidation motion, it did not admit all of the uncharged acts evidence.

The record gives us no reason to believe that the trial court would have ruled differently had defense counsel filed written opposition or made longer arguments at the hearing and we reject Dye's suggestion that counsel was ineffective. Moreover, we examined the rulings regarding consolidation and the admission of uncharged acts evidence and found no error. Thus, Dye has not established that he was prejudiced by counsel's failure to file written opposition. (Supra, at parts IB & C.)

Dye contends that counsel did not adequately prepare for trial because he failed to investigate potential exculpatory witnesses in the Antillon case, specifically individuals that would testify as to her bipolar attacks and lying and another individual that saw Dye and Antillon together nine weeks after he allegedly disappeared. Defense counsel indicated that the individuals Dye had listed could not assist the defense because they were not present during the time period in question. Regardless, defense counsel indicated he would have an investigator interview the witnesses on the Antillon case. On this record, there is no reasonable probability that the omission of these unnamed witnesses adversely affected the trial outcome.

Finally, Dye contends that defense counsel failed to adequately cross-examine Antillon because he did not include any questions regarding a "jilted lover defense" and gave only a one-page closing argument. Decisions regarding the scope of cross-examination and closing argument are tactical in nature and where, as here, the record sheds no light regarding the reason for counsel's actions a claim of ineffective assistance must be rejected as we will not "second-guess" defense counsel's tactical decisions. (People v. Stewart (2004) 33 Cal.4th 425, 459.)

Id. at 27-28.

## 2. Federal Law and Analysis

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must successfully meet a two-prong test. First, he must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. The

"[r]eview of counsel's conduct is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." <u>Hensley v. Crist</u>, 67 F.3d 181, 184 (9th Cir. 1995); <u>Strickland</u>, 466 U.S. at 689.   Second, Petitioner must establish counsel's deficient performance prejudiced the defense. <u>Strickland</u>, 466 U.S. at 687.   This requires a showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable." <u>Id.</u>   To satisfy the test's second prong, Petitioner must show a reasonable probability that the result of the proceeding would have been different but for the error. <u>Williams</u>, 529 U.S. at 406; <u>Strickland</u>, 466 U.S. at 694.   A reviewing court "need not decide whether counsel's performance was deficient when the claim of ineffectiveness may be rejected for lack of prejudice." <u>Jackson v. Calderon</u>, 211 F.3d 1148, n.3 (9th Cir. 2000) (citing <u>Strickland</u>, 466 U.S. at 697).

### a. Failure to Investigate

Petitioner complains that trial counsel failed to investigate potential exculpatory or impeaching witnesses. Pet.'s Mem. at 14-17. For example, Petitioner argues that trial counsel should have investigated "potential witnesses in the Antillon case who could have testified as to her bipolar attacks and lying." <u>Id.</u> at 15.   He specifically identifies Milagro Morrow-Lezama, "a friend of Petitioner and cousin to Antillon whom [sic] introduced Petitioner and Antillon," as a witness who "would have testified as to Antillon's lying, forgetfulness and problems." <u>Id.</u>   He also states that other witnesses, including Rena Kastris, Andrew Scianemea, and Peter Morales, employees at the restaurant where Petitioner worked, "could have put Petitioner with Mrs. Antillon nine weeks after the alleged incident, refuting her

1  claim of his disappearing [sic]."  Id.  Finally, Petitioner argues that

2  the testimony of a jewelry store owner and Maria De Los Reyes could have

3  been used to impeach both Antillon and Gary Cates on several points.[8]

4  Id. at 15-16.

5      Petitioner's arguments are not supported by the record.  As the

6  court of appeal stated, trial counsel knew about the potential witnesses

7  and determined that the they "could not assist the defense because they

8  were not present during the time period in question."  Lodgment 7 at 28;

9  see also Lodgment 3, Volume 4C at 136-37.  He also determined that

10  "these are not the type of witnesses that can really help [Petitioner]

11  in any fashion."  Lodgment 3, Volume 4C at 136-37. Regardless, trial

12  counsel indicated that he intended to hire an investigator to interview

13  the witnesses.  Id. at 149; Lodgment 7 at 28; Lodgment 3, Volume 4 at

14  116.  In fact, trial counsel later stated that he hired "Dennis Sesma's

15  office to do some investigation."  Lodgment 3, Volume 4 at 201.  During

16  trial, counsel further stated that he had investigators "beating the

17  bushes for [Petitioner] to find witnesses he's told us would be of

18  assistance for him."  Lodgment 3, Volume 6 at 542.  Additionally,

19  although trial counsel may not have independently interviewed witnesses,

20  interview statements taken by Petitioner's previous trial attorneys and

21  investigators were made available to him.  Lodgment 3, Volume 4 at 87,

22  101, 103; see also Pet.'s Appendix 44 (Declaration of Stephen G. Cline).

23  Counsel's decision not to investigate further was not objectively

24

25      [8]Gary Cates testified about facts relating to Petitioner's bail jumping charge
   and his efforts to locate Petitioner after Petitioner failed to appear on the Phillips
26  case on January 23, 2003.  Lodgment 3, Volume 5 at 406-424.  Maria De La Reyes cosigned
   Petitioner's bond application and described herself as his girlfriend.  Id. at 409-11.
27  Ms. De La Reyes was contacted by Mr. Cates "by telephone in April 2003, three months
   after Mr. Dye failed to appear for a court hearing."  Lodgment 1, Volume 2 at 484; see
28  also  Lodgment 3, Volume 5 at 411.

1   unreasonable.  See Strickland, 466 U.S. at 691 ("Counsel has a duty to

2   make reasonable investigations or to make a reasonable decision that

3   makes particular investigations unnecessary.").

4       As Respondent states, "[i]t is still unclear as to what efforts

5   were ultimately made by trial counsel and to where those endeavors may

6   have ultimately led." Resp.'s Mem. at 25.  In any event, Petitioner

7   fails to present declarations by Milagro Morrow-Lezama, Rena Kastris,

8   Andrew Scianemea, Peter Morales and the jewelry store owner that would

9   substantiate their purported testimony, availability, and willingness to

10  testify.[9]  In presenting a claim of ineffective assistance based on

11  counsel's failure to call witnesses, Petitioner must identify the

12  witness, United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985),

13  show that the witness was available and willing to testify, United

14  States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988), and show that

15  the witness' testimony would have been sufficient to create a reasonable

16  _____

17      [9]Petitioner attaches a declaration by Ms. De La Reyes regarding Mr. Cates' trial
    testimony.  Pet.'s Appendix 42; see also Lodgment 1, Volume 2 at 483-88. The
18  declaration was filed in superior court on August 26, 2004.  Lodgment 1, Volume 2 at
    483.  In her declaration, Ms. De La Reyes states that Mr. Cates fabricated numerous
19  events, including a discussion "relating to Mr. Dye stalking [her], following [her],
    and trailing [her]." Id. at 485.  Ms. De La Reyes maintains that such a discussion
20  never occurred.  Id.  Her declaration conflicts with Mr. Cates' trial testimony on
    other small points as well.  See id. at 483-87.  The trial judge was made aware of Ms.
21  De La Reyes' declaration and found that "it has absolutely nothing to do with his guilt
    or innocence in this case" and that "it doesn't change the testimony of the two primary
22  victims...." Lodgment 3, Volume 6 at 655, 667.  This Court agrees.  Although Ms. De
    La Reyes' testimony may have been used to impeach Mr. Cates testimony on small points,
23  the result of the trial would have been the same.  As stated above, Mr. Cates testified
    regarding Petitioner's bail jumping charge and his efforts to locate Petitioner after
24  he failed to appear on the Phillips case on January 23, 2003.  Lodgment 3, Volume 5 at
    406-424.  He did not testify to the facts underlying the Phillips charges or the
25  Antillon charges.  See id.  As to the bail jumping charge, Petitioner admitted that he
    skipped bail.  Lodgment 3, Volume 4C at 129, 143.  Moreover, Mr. Cates' testimony
26  regarding Petitioner's whereabouts after he skipped bail was corroborated by numerous
    witnesses, including Susan Baddor, Lennie Bironne, Katherine Speaks and John Duffy.
27  Lodgment 3, Volume 6 at 452-525.  Therefore, the Court finds that it is not reasonably
    likely that the outcome of the trial would have been different had trial counsel called
28  Ms. De La Reyes to testify.

doubt as to guilt.  <u>Tinsley v. Borg</u>, 895 F.2d 520, 532 (9th Cir. 1990); <u>see also</u> <u>United States v. Berry</u>, 814 F.2d 1406, 1409 (9th Cir. 1989) (holding that where defendant did not indicate what witness would have testified to and how such testimony would have changed the outcome of the trial, there can be no ineffective assistance of counsel). Generally, this requires submission of affidavits from the uncalled witnesses.  <u>Dows v. Wood</u>, 211 F.3d 480, 486 (9th Cir. 2000), <u>cert. denied</u>, 531 U.S. 908 (2000); <u>see also</u> <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1088 (9th Cir. 2001), <u>amended by</u> 253 F.3d 1150 (9th Cir. 2001) (mere speculation of possible helpful information from potential witnesses is not sufficient to show ineffective assistance of counsel); <u>Howard v. O'Sullivan</u>, 185 F.3d 721, 724 (7th Cir. 1999) ("failure to submit supporting affidavits from [the] potential witnesses would severely hobble [the petitioner's] case.").  Thus, Petitioner's claim that these witnesses could have provided potentially exculpatory or impeaching testimony is merely speculation and without evidentiary support.

Moreover, as the Court of Appeal reasonably found based on the record before it, there is no evidence that the omission of these witnesses adversely affected the trial outcome.  Lodgment 7 at 28. There was overwhelming evidence of Petitioner's guilt on counts two, three, four, five and six.[10]  <u>Allen v. Woodford</u>, 395 F.3d 979, 992 (9th Cir. 2005), <u>cert. denied</u>, 546 U.S. 858 (2005) ("[T]o the extent that any claim of error ... might be meritorious, we would reject that error as harmless because the evidence of [petitioner's] guilt is overwhelming.").  In particular, the trial judge found Antillon to be "a

---

[10]As stated above, Petitioner was acquitted on count one.  Lodgment 3, Volume 6 at 641.

very credible witness." Lodgment 3, Volume 6 at 643. And, Antillon's testimony was corroborated by several witnesses, including John Reese, Richard Metz, Deborah Walker, Christopher McGilvary, Jeffrey Bricker, Randy Gibson and Phil Sowers. Lodgment 3, Volume 5 at 288-323, 333-88; Lodgment 3, Volume 6 at 527-32, 609-19. It also was corroborated by the physical evidence, including the receipt for the purchase of the gold chain, showing that it cost $3,000. Lodgment 3, Volume 5 at 303-04. The prosecution also introduced the two forged checks as well as testimony that handwriting analysis could not eliminate Petitioner as the person who wrote the checks. Id. at 308-09; Lodgment 3, Volume 6 at 527-32. In light of the overwhelming evidence of Petitioner's guilt, there is no indication that the outcome would have been different had these witnesses testified. Accordingly, the state court's determination that counsel did not provide ineffective assistance of counsel in this respect was not an unreasonable decision.

### b. Failure to File Written Opposition

Petitioner's claim that trial counsel provided ineffective assistance of counsel when he failed to file a written opposition to the prosecution's motion for admission of uncharged acts evidence is without merit. Pet.'s Mem. at 20. The trial judge specifically told counsel that oral responses were "perfectly acceptable." Lodgment 3, Volume 4 at 38, 103, 162. The record indicates that trial counsel followed the court's instruction and orally opposed the motion. Lodgment 3, Volume 4 at 179-181. And, counsel's oral opposition was partially successful in that the judge prohibited the government from using some of the requested uncharged acts evidence. Id. at 181-185. Accordingly, Petitioner has not and cannot establish that counsel's actions were "outside the wide range of professionally competent assistance" or that

the alleged failure impacted the judge's ruling.  <u>Strickland</u>, 466 U.S. at 689; <u>see</u> <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take futile action can never be deficient performance"). Moreover, as discussed below, this Court has determined that no federal or constitutional error occurred as a result of the trial court's admission of the uncharged acts testimony.  <u>See</u> <u>infra</u> Discussion section C(3).  Accordingly, this claim fails.

### c. Inadequate Cross-Examination

#### i. Phillips

Petitioner also argues that trial counsel conducted an insufficient cross-examination of Phillips.  Pet.'s Mem. at 18.  He argues that the cross-examination was "astonishingly brief" and "irrational in light of the available impeachment evidence."  <u>Id.</u>  Although trial counsel's cross-examination of Phillips was relatively short compared to the prosecution's direct-examination, the Court finds that it was not deficient.  Trial counsel focused on counts eight (residential burglary) and nine (grand theft of personal property) and attempted to discount Phillips' account of the events in question.  Lodgment 3, Volume 5 at 240-42, 245-46.  For example, trial counsel questioned Phillips' contention that she did not have her credit cards and personal identification in her possession on the day in question.  <u>Id.</u> at 241-42. He also examined Phillips about her living arrangement with Petitioner in an attempt to establish that Petitioner was a renter and therefore legally entitled to enter Phillips' house on the day in question.  <u>Id.</u> at 245.  While Petitioner argues there were additional lines of potential cross-examination and impeachment available to counsel, the ones utilized by counsel constituted an objectively reasonable performance.  <u>See</u> <u>Dows v. Woods</u>, 211 F.3d 480, 487 (9th Cir. 2000)

("[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards.")

Petitioner specifically argues that counsel failed to utilize potential impeachment evidence. Pet.'s Mem at 18. In support of his position, he submits declarations from a witness and a former attorney. Id.; Pet.'s Appendix 40, 44. The witness states that Phillips used illegal drugs, made positive statements about Petitioner and the fact that he took care of her financially, and asked the witness to lie for her by stating that Petitioner returned to the building and took things from the apartment. Pet's Appendix 40. The attorney's declaration indicates that his file, which he gave to trial counsel, contained notes about another witness who had been to Phillip's home and would testify that Phillips used illegal drugs and Petitioner appeared to financially support Phillips. Pet.'s Appendix 44. Both declarations indicate that the information was provided to trial counsel. As such, it appears that counsel made a strategic decision not to cross-examine Phillips with this impeachment information. While an argument can be made that counsel should have used the impeachment information during his cross-examination, this Court cannot say that it was unreasonable not to do so, especially since the trier of fact was a judge. Strickland, 466 U.S. at 688-89 (counsel's representation must be "objectively reasonable", not flawless or ideal).

Even assuming Petitioner's trial counsel's cross-examination constituted deficient performance, Petitioner cannot establish prejudice, i.e., that the outcome of his trial would have been different had his trial counsel questioned Phillips about the impeachment

information or presented it via the other witnesses.  The trial judge found Phillips to be "an exceptionally credible witness" (lodgment 3, volume 6 at 643) and her testimony was corroborated by numerous witness, including Tito Voitel, Henry Taylor, James Stewart, Jolee McKowen and John Duffy (lodgment 3, volume 5 at 249-82; lodgment 3, volume 6 at 436-52; 490-505).  Her testimony also was consistent with the physical evidence presented at trial, including an altered copy of her California driver's license that Petitioner used when he attempted to rent a room from Ms. McKowen in Denver.  Lodgment 3, Volume 5 at 234-35; Lodgment 3, Volume 6 at 443-44.  While the potential impeachment evidence may have impacted the court's assessment of Phillips, it would not have invalidated the substance of her testimony, given the peripheral nature of the impeachment[11] and the strength of the corroborating evidence. Because there was overwhelming evidence of Petitioner's guilt on the Phillips charges, Petitioner cannot establish that the outcome of those charges would have been different had counsel asked different questions or called other impeachment witnesses.

### ii. Antillon

Petitioner further argues that trial counsel failed to adequately cross-examine Antillon because he did not include any questions regarding a "jilted lover defense."  Pet.'s Mem. at 19.  The Court finds that although Petitioner may take issue with counsel's strategy in

---

[11] The fact that during her romantic relationship with Petitioner, Phillips may have bragged to other women that Petitioner was supporting her financially or that other women believed that to be the case has little, if any, bearing on the charged crimes.  Similarly, even if Phillips did use illegal drugs, there is no reason to believe that fact would have changed the trial judge's determinations of guilt.

hindsight[12], counsel made a reasonable tactical decision and his performance in this regard fell well within "the wide range of reasonable professional assistance." See Strickland, 466 U.S. at 689. Through cross-examination of Antillon and direct-examination of defense witnesses, trial counsel attacked Antillon's credibility. Specifically, trial counsel challenged whether Antillon's testimony was consistent with previous statements she had made to a defense investigator, Shannon Lodder-Pollard. Lodgment 3, Volume 5 at 317-18, 320. He also called Ms. Lodder-Pollard to testify about Antillon's previous statements, which revealed numerous inconsistences with Antillon's trial testimony. Lodgment 3, Volume 6 at 584-597.

In any event, Petitioner cannot establish prejudice. The evidence against him on counts two, three, four, five and six was strong. Antillon directly testified to the events in question. Lodgment 3, Volume 5 at 288-323. As stated above, the trial judge found her to be "a very credible witness" (Lodgment 3, Volume 6 at 643) and her testimony was corroborated by numerous witnesses as well as the physical evidence (see supra Discussion section B(2)(a)). Therefore, it is not reasonably likely that the outcome of the trial would have been different had counsel included questions regarding a "jilted lover

---

[12]The Court notes that trial counsel repeatedly consulted with Petitioner throughout the cross-examination of Antillon (lodgment 3, volume 5, 381-21) and prior to concluding his cross-examination of Ms. Phillips (id. at 242) so Petitioner had the opportunity to assist in his defense and suggest topics for cross-examination. If Petitioner suggested those lines of cross-examination and counsel chose not to pursue them, that decision is a strategic trial decision entitled to great deference. Strickland, 466 U.S. at 689; Dows, 211 F.3d at 487. Petitioner presents no evidence to support his assertion that additional examination relating to a "jilted lover defense" would have convinced the judge to discount Antillon's credibility, especially in light of the overwhelming evidence and the fact that the trial judge heard testimony that the Antillon and Petitioner were in a relationship and it ended with an allegation that Petitioner stole from Antillon.

1  defense."  Accordingly, the state court did not err in determining that

2  the counsel did not provide ineffective assistance in this respect.

3            **d. Inadequate Closing Argument**

4      Petitioner  further  argues  that  trial  counsel  delivered  an

5  inadequate closing argument because it was "one page" and "mentioned

6  only one of eleven counts charged." Pet.'s Mem. at 20.  The Court finds

7  that Petitioner's allegation is without merit.   The United States

8  Supreme Court has emphasized the deference that must be accorded to

9  trial counsel in making closing argument:

10         ... counsel has wide latitude in deciding how best to
           represent a client, and deference to counsel's tactical
11         decisions in his closing presentation is particularly
           important because of the broad range of legitimate defense
12         strategy at that stage. Closing arguments should "sharpen and
           clarify the issues for resolution by the trier of fact, but
13         which issues to sharpen and how best to clarify them are
           questions with many reasonable answers ... Judicial review of
14         a defense attorney's summation is therefore highly
           deferential–and doubly deferential when it is conducted
15         through the lens of a federal habeas.

16  Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (internal citations

17  omitted).

18      In the present case, trial counsel focused his closing argument on

19  the residential burglary charges (counts one and eight).  Lodgment 3,

20  Volume 6 at 640-41. With respect to count one, his attorney emphasized

21  the "highly questionable" state of the evidence.  Id. at 640.  He

22  stressed that Antillon did not know "where her bracelet was" and that

23  she had made "several statements, both pro and con" regarding whether or

24  not Petitioner ever entered her son's house.  Id. With respect to count

25  eight, trial counsel stated that there were "no witnesses showing him

26  actually going ... in the Phillips house."  Id.  In the alternative,

27  trial counsel argued that Petitioner may have picked up some of

28  Phillips' belongings as an "afterthought."  Id. Given the overwhelming

evidence against Petitioner and the fact that a judge was the decision-maker, the Court finds that it was not unreasonable for trial counsel to limit his closing statement to making focused challenges to the two "weakest" counts. <u>Yarborough</u>, 540 U.S. at 5-6.   In fact, the court acquitted Petitioner of one of the crimes specifically challenged by counsel during his closing argument.   Lodgment 3, Volume 6 at 641.

Even assuming the closing argument was inadequate, this Court finds no "reasonable probability" that a "better" closing argument would have made a significant difference.   As mentioned throughout this order, the evidence against Petitioner on counts two through eleven was overwhelming.   <u>See</u> <u>Bonin v. Calderon</u>, 59 F.3d 815, 836 (9th Cir. 1995) ("[I]n cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel.") (internal quotations omitted).   Both victims, Phillips and Antillon, testified to the events in question.   Lodgment 3, Volume 5 at 210-46, 288-323.   Their testimony was consistent with the testimony of other witnesses, as well as with the physical evidence presented at trial.   <u>See</u> Lodgment 3, Volume 5 at 249-82, 288-323, 333-88; Lodgment 3, Volume 6 at 436-52, 490-505, 527-32, 609-19.   Moreover, the prosecution called eight witnesses who testified to a similar pattern of victimization, evidencing Petitioner's intent and a common plan or scheme.   Lodgement 3, Volume 5 at 324-32, 394-406; Lodgment 3, Volume 6 at 436-90, 507-25; 550-67, 569-83.   Finally, with respect to count seven, the bail jumping charge, Petitioner admitted that he skipped bail and failed to appear in court on January 23, 2003.   Lodgment 3, Volume 4C at 129, 143.   Given the overwhelming evidence of guilt and that the factfinder was a judge, there is no reasonable probability that a "better" or longer closing argument would have changed the result.   In

sum, Petitioner fails to establish that counsel's closing statement was deficient and that he was prejudiced by the alleged error.  Accordingly, the state court did not err in concluding that Petitioner did not receive ineffective assistance of counsel in this respect.

### e. Inadequate Representation on Appeal

Finally, Petitioner argues that appellate counsel "failed to cite Federal law in regards to Petitioner's claim of the admittance of the prior bad act evidence."  Pet.'s Mem. at 20.  He argues that this failure "was objectively unreasonable and resulted in prejudice."  Id. at 21.  Petitioner's claim lacks merit.  As discussed in detail below, this Court has determined that no federal or constitutional error occurred as a result of the trial court's admission of the uncharged acts testimony.  See infra Discussion section C(3).  Therefore, Petitioner's failure to cite federal law was not deficient.  See Rupe, 93 F.3d at 1445 ("[T]he failure to take futile action can never be deficient performance").  For the same reason, Petitioner cannot show that appellate counsel's failure resulted in prejudice as Petitioner would not have achieved a more favorable outcome on appeal had appellate counsel cited federal law.  Accordingly, this claim also fails.

As discussed above, Petitioner has failed to establish that he received ineffective assistance of counsel and the Court finds that the court of appeal's decision was not contrary to or an unreasonable application of clearly established law, nor was it an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  There fore the Court **DENIES** habeas relief on this claim.

## C. Due Process Claim

Petitioner argues that the superior court violated the Due Process Clause of the Fourteenth Amendment by allowing the prosecution to

present evidence of his other "uncharged acts." Pet.'s Mem. at 23.  He
maintains that this "emotionally charged evidence" was "used for nothing
more than to establish [his] propensity to commit certain crimes" and,
as such, rendered his trial "fundamentally unfair." Id. at 23, 28.
Respondent counters that such evidence was properly admitted not as
propensity evidence, but to show a common plan, motive, or scheme.
Resp.'s Mem. at 40. As a result, its admission did not violate the Due
Process Cause and the court of appeal's determination on that point was
not an unreasonable application of federal law or an unreasonable
determination of the facts. Id.

**1. Other Act Evidence Admitted at Trial**

At trial, pursuant to California Evidence Code § 1101(b), the
prosecution presented evidence of the following uncharged acts involving
similar conduct by Petitioner:

> In 1990, Sharon Halperin met Dye in a nightclub in
> Chicago, Illinois where he introduced himself under a false
> name. Halperin agreed to go out with Dye the next day and she
> gave him her telephone number, but not her address. The
> following day, Dye appeared at her house with flowers and
> asked her to dinner. After Halperin agreed, Dye suggested that
> she go upstairs to change her clothes, leaving her purse on a
> table. When Halperin returned, Dye had disappeared along with
> the flowers, some of her money and jewelry.

> In October 1995, Mary Ann Ryan and her friend Debbie met
> Dye in a Chicago restaurant where he introduced himself as
> "Tommy O'Shay." Dye accompanied the women home, offering to
> move some furniture for them. At some point, Debbie asked Dye
> to leave after she found him looking through Ryan's wallet.
> The following morning, Ryan discovered that her car key and
> car were missing.

> Later that month, Nikki Main met Dye, who went by the
> name of "Tommy O'Shay," after he answered an ad for a roommate
> in Chicago. Dye moved in and became involved with Main's
> female roommate. On three separate occasions, Main found money
> missing from her dresser and later discovered that her cell
> phone was missing, but did not realize that Dye had taken the
> items. After Main had given Dye her bank card PIN number to
> process a transaction for her, she discovered that her card

36

was missing, $550 had been taken from her account and Dye had disappeared.

In January 2003, Katherine Tomoko Speaks met Dye in a restaurant in Seattle where he worked as a waiter and used the name "David Nelsen." They became romantically involved and Dye visited her condominium from time to time. While dating Dye, Speaks discovered money missing from her bank account, which Dye admitted taking after she confronted him about it. At some point, Dye visited the apartment of Speaks's landlord, Lennie Bironne, where Bironne had left several credit cards on a table. The following day, Bironne discovered that one of his credit cards was missing and had been used the previous night. After Bironne informed Speaks of the incident, Dye disappeared with some of her belongings.

In July 2003, Dye introduced himself to Susan Baddour as "Tommy Taglia" when they met at a bar in Seattle, Washington. After dating Baddour for about a week, Dye took her car under the pretense that he would get it repaired for her; however, he did not return and she never heard from him again.

Lodgment 7 at 16-18.

## 2. The California Court of Appeal's Decision

The California Court of Appeal determined that the uncharged acts evidence was properly admitted. The court explained,

Here, the uncharged acts were sufficiently similar to the charged crimes and they were reasonably admitted as tending to show intent and common plan. The incidents involving Halperin, Ryan, and Bironne revealed that Dye gained the trust of his victims so he could obtain access to their homes and tended to show that he harbored the intent to steal when he entered the homes. With Main, Speaks and Baddour, Dye became romantically involved with the victim or another individual and again used his position of trust to gain access to banking information or a vehicle. Similarly here, Dye used his position of trust with Phillips and Antillon to obtain access to their homes, personal property, money or checks. We conclude that the trial court did not abuse its discretion in admitting this evidence.

A trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code, § 352.) Dye complains that the trial court failed to properly balance the probative value against the unduly prejudicial effect of the uncharged crimes evidence because it failed to mention these factors in its oral ruling

on the prosecution's in limine motion to admit this evidence. Our review of the record reveals that Dye objected to the uncharged crimes evidence solely on Evidence Code section 1101 grounds, specifically that the uncharged crimes were dissimilar and unnecessary to prove any element of the charged crimes. Dye did not challenge the evidence as unduly prejudicial under Evidence Code section 352 and he may not now complain that the evidence was inadmissible on this ground. (People v. Mickey (1991) 54 Cal.3d 612, 689; Evid.Code, § 353.)

To the extent that considering the prejudicial effect of uncharged crimes evidence is inherent in evaluating whether such evidence should be admitted under Evidence Code section 1101 (People v. Ewoldt, supra, 7 Cal.4th at p. 404), Dye's argument ignores the fact that he waived a jury trial. In a bench trial, factors such as the inflammatory nature of the crime, confusion of the issues, and the consumption of time involved in addressing the prior offenses are less significant than they would have been in a jury trial.

Dye also argues that the trial court improperly allowed the prosecutor to argue the uncharged crimes evidence for propensity purposes; however, he fails to explain how the prosecutor's argument prejudiced him. Dye cannot claim error based on this improper argument because the trial court is presumed to know and follow the law that such evidence may not be used to prove propensity. (People v. Mosley (1997) 53 Cal.App.4th 489, 496; Evid.Code, § 1101, subd. (a).) In fact, in ruling on the in limine motion to admit the uncharged crimes evidence, the trial court considered the arguments of counsel and allowed only some of the evidence proffered by the prosecution on the ground it was relevant to show plan, motive, intent or scheme.

Finally, Dye argues that the trial court's comments show it improperly used the uncharged acts evidence for propensity purposes in finding him guilty. However, the portions of the record cited by Dye do not support this conclusion. The trial court noted that Phillips was an "exceptionally" credible witness and, in deciding the residential burglary charge as to her, commented that all it needed to do was look at how Dye operated, ingratiating himself with his victims and working his way into their lives through distortion and fraud. To the extent this comment reflects the uncharged crimes evidence, it appears that the trial court properly considered the evidence for purposes of showing a common plan, motive or scheme.

After making findings on all counts, the court summarized the guilt phase by stating Dye would scout out environments looking for items to steal and, after noting Speaks's testimony that Dye did not believe he was guilty of anything, stated: "That typifies you, Mr. Dye. You're a crook, a thief, a very sophisticated, but you're a crook." These comments, however, do not affirmatively demonstrate that the court misunderstood the proper use of the uncharged crimes evidence,

particularly in light of the presumption that it knew and followed the law.

Lodgment 7 at 19-21.

### 3. Federal Law and Analysis

The question of whether evidence of prior bad acts was properly admitted under California law is not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 67 (1991) (mere errors in the application of state law does not warrant the issuance of the federal writ); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Therefore, the only question before this Court is whether the trial court committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated federal due process. Estelle, 502 U.S. at 68, 70; Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998).

A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and ... the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)). Thus, the erroneous admission of evidence violates due process when "there are no permissible inferences the jury may draw [from the evidence]." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) (quoting Jammal, 926 F.2d at 920). Even then, evidence must "be of such quality as necessarily prevents a fair trial." Jammal, 926 F.2d at 920 (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Generally, "other acts" evidence may not be admitted for the purpose of showing that the accused has bad character and therefore the propensity to have committed the crime. See McKinney v. Rees, 993 F.2d

1378, 1380-81 (9th Cir. 1993).[13]   However, California Evidence Code § 1101 provides for admission of such evidence when relevant to prove a fact other than propensity, such as intent, plan, knowledge, or absence of mistake or accident.   Cal. Evid.Code § 1101(b).   Here, as the California appellate court properly found, the eight uncharged acts were sufficiently similar to the charged crimes to show intent and common plan or design.   See McKinney, 993 F.2d at 1383-85 (admission of prior bad acts comports with due process where such evidence is relevant to any element of the charged offense, and it was not introduced to show defendant's predisposition to commit a crime).   In particular, the admitted evidence supported the inference that Petitioner gained the trust of Phillips and Antillon, and then, as he did with the other victims, used his position of trust to access their homes, personal property, money and checks.   Because there were rational and constitutionally-permissible inferences the jury could draw from the evidence (i.e. that the uncharged acts and the charged offenses evidenced a common design or plan), the admission of the challenged evidence did not render the trial so arbitrary or fundamentally unfair

---

[13]The United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001) (overruled on other grounds by Woodford v. Garceau, 538 U.S. 202 (2003)).  Instead, the Supreme Court has expressly left open this question.  See Estelle, 502 U.S. at 75, n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime ."); see also Mejia v. Garcia, 534 F.3d 1036, 1047 (9th Cir. 2008) ("[T]he United States Supreme Court has never established the principle that introduction of evidence of uncharged offenses necessarily must offend due process."); Alberni v. McDaniel, 458 F.3d 860, 863-67 (9th Cir. 2006) (denying claim that the introduction of propensity evidence violated due process because "the right [petitioner] asserts has not been clearly established by the Supreme Court, as required by AEDPA"), cert. denied, 549 U.S. 1287, (2007).  This analysis provides an independent basis to deny Petitioner's claim.

as to violate Petitioner's right to due process. <u>Boyde</u>, 404 F.3d at 1172; <u>Jammal</u>, 926 F.2d at 920; <u>Kealohapauole</u>, 800 F.2d at 1465. Therefore, the state court's rejection of this claim was not contrary to or an unreasonable application of clearly established law, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   28 U.S.C. § 2254(d).

Moreover, any prejudice flowing from the uncharged acts evidence was mitigated by the fact that the case was tried to a judge, not a jury.   As the court of appeal stated, "the trial court is presumed to know and follow the law that [other bad acts] evidence may not be used to prove propensity."   Lodgment 7 at 20; <u>see also</u> <u>Harris v. Rivera</u>, 454 U.S. 339, 346, 346 (1981) (<u>per</u> <u>curiam</u>)("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.").   Furthermore, the guilty verdict was not dependent on the other bad act evidence alone.   The prosecution put on strong, direct evidence, separate and apart from the uncharged acts evidence, that Petitioner committed the charged offenses.   For example, as discussed above, both Phillips and Antillon testified to the events that formed the basis of the charged crimes and their testimony was corroborated by other witnesses as well as with the physical evidence presented at trial.   Lodgment 3, Volume 5 at 210-46, 249-82, 288-323, 333-88; Lodgment 3, Volume 6 at 436-52, 490-505, 527-32, 609-19.   For these reasons, any alleged error in admitting the prior bad act evidence did not have "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993); <u>see</u> <u>also</u> <u>Penry v. Johnson</u>, 532 U.S. 782 (2001). Accordingly, relief is **DENIED** on this claim.

**D. Evidentiary Hearing**

Finally, Petitioner requests an evidentiary hearing on his speedy trial and ineffective assistance of counsel claims. Pet.'s Mem. at 21-22; doc. no. 13. Petitioner alleges that such a hearing is necessary in order to resolve "substantial evidentiary conflicts between the parties." Doc. No. 13 at 3. Specifically, Petitioner would like the Court to determine (1) whether the Martino and Cline affidavits present new evidence, (2) whether the Illinois governor's letter allowed California to obtain custody of Petitioner, (3) whether Petitioner asserted his right to a speedy trial prior to his extradition, (4) whether the state attempted any "other means" to obtain Petitioner, (5) whether prosecutor Locke's testimony was competent, (6) whether trial counsel actually conducted the promised investigation, (7) whether the proposed witnesses had value, (8) whether trial counsel uncovered anything of value, and (9) whether appellate counsel was ineffective for failing to federalize Petitioner's state claim. Id. at 3-6. An "evidentiary hearing is not required on issues than can be resolved by reference to the state court record." Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998); see also United States v. Birtle, 792 F.2d 846, 849 (9th Cir. 1986) (an evidentiary hearing is not required "if the 'motion and the files and the records of the case conclusively show that Petitioner is entitled to no relief.'"). Here, the record, including the appendixes and attachments Petitioner affixed to his Petition and Reply, contain all the facts necessary to resolve Petitioner's claims. Based on this record, the Court has conclusively determined that all of Petitioner's claims lack merit. Moreover, Petitioner has not shown that his allegations, if proven at an evidentiary hearing, would entitle him to habeas relief. See Williams v. Woodford, 384 F.3d 567, 586 (9th Cir.

2004).   Accordingly, the Court finds that an evidentiary hearing is not warranted in this case.   Therefore, Petitioner's request is **DENIED**.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Petitioner's Petition for Writ of Habeas Corpus and his request for an evidentiary hearing.   The Clerk of Court is instructed to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED:  June 29, 2010

BARBARA L. MAJOR
United States Magistrate Judge

43                                                      09cv2483-BLM